## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

HENRY EUGENE HODGES,                )
                                    )
    Petitioner,               )
                                    )
                                    )    NO. 3:01-624
                                    )    JUDGE HAYNES
RICKY BELL, Warden, Riverbend       )
Maximum Security Institution,       )
                                    )
    Respondent               )

## **M E M O R A N D U M**

# TABLE OF CONTENTS

I  Introduction.................................................................................................... 1

   A. Discovery and Evidentiary Hearing Issues...................................... 5

      1. Review of State Court Record........................................................ 6

      2. Conclusions of Law.................................................................... 11

II Petitioner's Non-Defaulted Claims..................................................... 21

   A. Procedural History........................................................................ 21

   B. State Courts' Findings of Fact....................................................... 22

   C. Conclusions of Law...................................................................... 29

      1. Ineffective Assistance of Counsel Claims................................. 30

         a  Ineffectiveness of Trial Counsel................................... 31

         b. Ineffectiveness of Counsel at Sentencing..................... 43

         c. Ineffectiveness of Appellate Counsel........................... 54

         d. The Validity of Petitioner's Guilty Plea....................... 55

      2  Petitioner's Jury Claims........................................................ 56

         a. Voir Dire....................................................................... 56

         b. Jury Exemption.............................................................. 65

         c. Jury Instruction............................................................. 66

      3. State's Insufficient Proof of Aggravating Circumstances........... 72

      4. Victim's Mother's Presence at Trial......................................... 78

      5. The Testimony of the State's Medical Examiner........................ 77

      6. Denial of Expert Services......................................................... 80

Case 3:01-cv-00624  Document 312  Filed 03/28/08  Page 2 of 59 PageID #: 6557

7. Exclusion of TDOC Evidence .......................................................................82

8. Admission of Petitioner's Georgia Murder Conviction ...............................84

9. Tennessee's Proportionality Review of Death Sentences ...........................86

10. Unconstitutional Death Penalty Statute ....................................................88

11. Production of Dr. Nurcombe's Notes .........................................................89

12. Dr. Kyser's Testimony ................................................................................91

III. Defaulted Claims ...........................................................................................93

A. Claims Found by the State Court to be Defaulted ......................................97

B. Claims Challenged by Respondent as Defaulted ........................................96

C. Conclusions of Law ...................................................................................100

1. Noncompliance with Applicable State Rules .............................................104

2. "Firmly Established" and "Regularly Followed" State Rules .....................105

3. Independent and Adequate State Rule .......................................................106

4. Cause and Prejudice Requirement .............................................................108

a. Cause ......................................................................................................108

b. Prejudice ................................................................................................113

IV. Conclusion ..................................................................................................114

Case 3:01-cv-00624   Document 312   Filed 03/28/08   Page 3 of 59 PageID #: 6558

Petitioner, Henry Eugene Hodges, a state prisoner, filed this action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his first-degree murder conviction for which he received the death sentence. The Court granted Petitioner's motion for appointment of counsel. (Docket Entry Nos. 3 and 5). Petitioner's counsel filed an amended petition asserting claims under Article I § 9 and Article III of the United States Constitution as well as the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution (Docket Entry No. 32). The Respondent filed an answer (Docket Entry No. 39). In earlier proceedings, collateral issues arose about the Petitioner's conditions of confinement that the Court addressed in an Order (Docket Entry No. 100) that the Sixth Circuit later vacated. (Docket Entry No. 291).

In summary, Petitioner's amended petition[1] includes the following claims with numerous subparts, discussed _infra_:

(1) Denial of a fair and impartial jury in violation of the Sixth, Eighth, and Fourteenth Amendments, because the trial court precluded Petitioner from asking proper questions necessary to empanel a fair and impartial jury;

(2) denial of the effective assistance of counsel at trial and on appeal in violation of the Sixth and Fourteenth Amendments;

(3) the trial court's instructions at the sentencing proceeding were inaccurate and incomplete, in violation of the Eighth and Fourteenth Amendments;

(4) the trial court admitted testimony from prosecution witnesses that Petitioner showed no remorse in violation of the Eighth and Fourteenth Amendments;

(5) the trial court denied Petitioner funding for an expert in the field of genetic transmission of drug and alcohol dependency, and the effects of drug and alcohol

---

[1] Rule 15 of the Federal Rules of Civil Procedure applies in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the earlier petition.

1

abuse in violation of the Eighth and Fourteenth Amendments;

(6) the trial court allowed admission, as an aggravating circumstance, a Georgia conviction that occurred after the offense here in violation of the Due Process Clause of the Fourteenth Amendment;

(7) the State withheld material exculpatory evidence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments;

(8) Petitioner's death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because the State withheld material exculpatory evidence and presented false testimony at the sentencing phase of trial;

(9) the trial court allowed the State to intrude unconstitutionally into Petitioner's preparation for the sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment by: 1) ordering Petitioner to provide the State notice of witnesses Petitioner would present at his sentencing hearing; 2) ordering Petitioner to provide the State with his expert's report; 3) ordering Petitioner to submit to an evaluation performed by the State's experts, Drs. Kyser and Morgan; and 4) ordering that Petitioner to produce Dr. Nurcombe's notes from his interview of Petitioner and in preparation of his report;

(10) the trial court allowed educated persons fitting occupational categories to exempt themselves from jury service and denied Petitioner funds to employ an expert to provide statistical evidence in support of this claim in violation of the Sixth, Eighth, and Fourteenth Amendments;

(11) the trial court precluded Petitioner from inquiring of prospective jurors 1) whether they could consider mitigation evidence if they learned that Petitioner had previously been convicted of another murder; and 2) whether they believed that Petitioner would be incarcerated for the remainder of his life if the jury sentenced him to life imprisonment in violation of the Sixth, Eighth, and Fourteenth Amendments;

(12) the trial court failed to strike for cause prospective jurors who stated that they would automatically impose a death sentence; 2) struck for cause prospective jurors who, while they expressed reservations respecting the death penalty, indicated that they could follow the law; 3) failed to strike incompetent jurors; and 4) failed to strike a former girlfriend of a police officer who was involved in the investigation into the murder in violation of the Sixth, Eighth, and Fourteenth Amendments;

(13) the trial court and the prosecution obtained from prospective jurors a promise that if Petitioner was found guilty of first-degree murder, and if they found that

2

aggravating evidence outweighed mitigating evidence, they would do their "duty and obligation" to return a death sentence in violation of the Sixth, Eighth, and Fourteenth Amendments;

(14) the trial court did not prevent or rectify the prosecutors inflammatory conduct in violation of the Sixth, Eighth, and Fourteenth Amendments;

(15) the trial court denied Petitioner funds necessary to employ an expert to testify about genetic and environmental causes of substance abuse in violation of the Eighth and Fourteenth Amendments;

(16) the trial court denied Petitioner the right to present the jury with relevant mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments;

(17) the trial court denied Petitioner's request for specific sentencing instructions and gave the jury improper instructions in violation of the Eighth and Fourteenth Amendments;

(18) Petitioner's conviction and death sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner as incompetent to stand trial due to neurological, bio-chemical, and psychological impairments of the central nervous system and brain;

(19) Petitioner's conviction and death sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner was incompetent to plead guilty due to neurological, bio-chemical, and psychological impairments of the central nervous system and brain;

(20) Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because Petitioner' guilty plea was not made knowingly, intelligently or voluntarily;

(21) Petitioner's conviction and death sentence violate the Fifth, Sixth, Eight and Fourteenth Amendments to the United States Constitution because the prosecuting and/or law enforcement authorities coerced Trina Brown into changing her statement that she was in fact the true killer of the victim, Ronald Bassett;

(22) Petitioner's death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecutor knowingly presented the false testimony;

(23) Petitioner's conviction and death sentence violate the Sixth, Eighth, and Fourteenth Amendments because Petitioner is actually innocent of the crime of first

3

degree, premeditated murder;

(24) Petitioner's death sentence violates the Sixth, Eighth, and Fourteenth Amendments because of juror misconduct;

(25) Petitioner's death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because Tennessee's death penalty statute is unconstitutional;

(26) Petitioner's death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court denied Petitioner the right to participate in the voir dire process and to make an unsworn statement to his sentencing jury;

(27) The Tennessee appellate courts' proportionality review violated Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution;

(28) Electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments;

(29) Lethal injection constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments;

(30) In violation of the Eighth and Fourteenth Amendments, Petitioner is not competent to be executed  Ford v. Wainwright, 477 U.S. 399 (1986);

(31) The cumulative effect of the errors at trial denied Petitioner due process of law under the Fourteenth Amendment; and

(32) Petitioner was denied a full and fair state post-conviction proceeding due to errors of the post-conviction court.

See Docket Entry No. 32, Amended Petition at pp. 3-41). Within these claims are numerous subparts that are discussed infra. From the Court's review, in his supplemental brief, Petitioner presents additional claims. See Docket Entry Nos. 303 and 307.

In earlier proceedings, the Court entered several orders granting Petitioner's discovery requests. (Docket Entry Nos. 30, 79, 80 and 82). The Court also held a hearing on Petitioner's

4

additional discovery requests and on whether to conduct an evidentiary hearing on the merits of Petitioner's claims. The Court addresses those two issues first and thereafter decides the merits of Petitioner's exhausted claims and Respondent's procedural default contentions.

## A. Discovery and Evidentiary Hearing Issues

For his discovery subjects, Petitioner contends that in his state post-conviction proceedings: (1) the state trial court did not allow his counsel adequate time for discovery; (2) the state trial court denied funding of a mitigation specialist and physician with expertise in drug abuse disorders; (3) the state trial court denied his post-conviction counsel's request for a continuance despite the report of the mitigation specialist that her report was incomplete; (4) Petitioner's post-conviction counsel were unable to locate two witnesses: Trina Brown, Petitioner's accomplice who now insists that she murdered the victim and Leroy Thompson, a juror whose pain allegedly precluded him from deliberating at the sentencing; and (5) subsequent events reveal false testimony and misconduct by Dr. Charles Harlan, the medical examiner who testified at Petitioner's sentencing hearing.

For specific discovery, Petitioner seeks all of the files of the Federal Bureau of Investigation ("FBI") and the Tennessee Bureau of Investigation ("TBI") on the victim's murder, the files of the Metropolitan-Davidson County Medical Examiner's Office, and Petitioner's institutional records at the Metropolitan-Nashville Davidson County jail during his pretrial and pre-sentence confinement. Petitioner's requests for the FBI and TBI files are premised on Brown's incriminating statement and are cited as potential sources of Brady materials. The requests for the medical examiner's records are based upon Petitioner's assertions about Dr. Harlan. Petitioner also requests to take the depositions of detectives Bill Pridemore and Pat Postilone of the Metropolitan-Davidson County Police Department and Dr. Harlan. The Pridemore and Postilone deposition requests are also

5

premised upon Brown's statement and the search for <u>Brady</u> material.

Petitioner requests an evidentiary hearing on the issues of : (1) the ineffective assistance of his trial and appellate counsel (Docket Entry No. 32, Amended Petition at ¶ 2); (2) his competency at the time of his trial, <u>id.</u> at ¶ 30, 31, 32; (3) the prosecutors' withholding of exculpatory evidence namely, that Trina Brown and Dr. Charles Harlan's testimony was false, <u>id.</u> at ¶ 18, 19, 33, 34, 35); (4) a related claim that Brown and Dr. Harlan testified falsely; (5) the improper conduct of juror Thompson, <u>id.</u> at ¶36; (6) the State's method of execution that constitutes cruel and unusual punishment, <u>id.</u> at ¶ 42; and (7) his responses to the Respondent's contentions of procedural default. <u>See</u> Docket Entry No. 219, Petitioner's Response.

Respondent argues that Petitioner has not shown good cause for discovery and the discovery sought will not result in habeas relief and does not impact the claims that are properly before the Court. (Docket Entry No. 28).

The discovery and evidentiary hearing issues are factually interrelated. As discussed <u>infra</u>, the legal standards are also similar. Therefore, the Court will analyze these requests jointly. An initial review of the state court record is necessary to decide both issues.

### 1. Review of the State Court Record

Prior to the scheduled trial, the state trial court entered several orders appointing experts for the Petitioner. For sentencing issues, Petitioner had the assistance of a psychiatrist and psychiatric testing by a clinical psychologist who has a Ph.D. as well as private investigative services. (Docket Entry No. 40, Addendum No. 1, Volume 1, Order dated May 19, 1992). Dr. Barry Nurcombe, an accomplished and experienced psychiatrist interviewed Petitioner on several occasions. Dr. Pamela Auble, Ph.D., a clinical psychologist and neuropsychologist, administered a battery of psychiatric

6

tests to Petitioner. Dr. Ann Charvet, a clinical sociologist and mitigation specialist also provided services as reflected in the state courts' orders and their billing statements. Id. at Addendum No. 1, Orders of September 13, 1991, January 2, 1992 and May 19, 1992. Dr. Nurcombe's report was filed on December 13, 1991. Id. See also Hodges v. State, No. M1999-00516-CCA-R3-PD, 2000 WL 1562865 at **3-4 (Tenn. Crim. App. Oct. 20, 2000).

The state court record includes has extensive transcripts of the sentencing hearing and voir dire of the jury. (Docket Entry No. 40, Addendum No. 2, Volumes 1 through 10). The voir dire transcript includes the examination of juror Thompson. Id. at Volume 7, at pp. 926-43. At Petitioner's sentencing hearing, Petitioner's mother and brother testified about Petitioner's personal history. Dr. Nurcombe presented his evaluation of Petitioner at sentencing. Petitioner also had an evidentiary hearing on his motion for a new trial where the defense team unsuccessfully attempted to attack the veracity of Dr. Harlan's testimony.

For his post-conviction proceeding, the state trial court authorized payment for a forensic expert and mitigation specialist. Hodges, 2000 WL 1562865 at **28-30. As summarized by the Tennessee appellate court, Petitioner also presented testimony of Dr. Ann Charvet, a clinical sociologist about the mitigation efforts to Petitioner's trial. Id. at **9-10. Julie Hackenmiller, a mitigation specialist who was retained for the post-conviction hearing also testified about her research. Id. at **11-12. Hackenmiller had Petitioner's high school, medical and juvenile records, as well as Petitioner's family records and his psychiatric reports. Id. Hackenmiller did not have Petitioner's Georgia and Florida prison records and assert that she "needed more time to interview one of the [Petitioner's] school principals regarding teasing by other students endured by the [Petitioner]". Id. at *11. Petitioner's counsel also attained a concession from Dr. Bruce Levy, the

7

medical examiner for Metropolitan-Davidson County and Chief Medical Examiner for the State of Tennessee, that he disagreed with Dr. Harlan's opinion on the length of time before the victim died. Id. at *13.

The State post-conviction record also includes an affidavit of Dr. Kris Sperry that Dr. Harlan's testimony "grossly exaggerates the time" the victim was conscious. Id. at **15-16. Petitioner examined his three trial counsel extensively. Id. at **4-9. In addition to his three trial counsel, Petitioner called the chief counsel of the Tennessee District Public Defender agency to opine on Petitioner's trial counsel's work. Id. at *10. The testimony of Petitioner's trial counsel in the post-conviction proceeding is two volumes. (Docket Entry No. 40, Addendum No. 8, Volumes 1 and 2).

In a videotaped statement, Trina Brown recants her testimony at Petitioner's trial. This videotaped statement represents another instance of Brown's inconsistency about her role in the victim's death. At Petitioner's sentencing hearing, Brown also claimed responsibility for the victim's death. As the state appellate court found:

> Trina Brown testified that the appellant did not want to kill the victim and that it was she, not the appellant, who made the decision to kill the victim. FN8 She was afraid that if the victim was permitted to live, he would have the appellant arrested, and as a result, she would lose the appellant. Therefore, she told the appellant to kill the victim. The appellant admitted on cross-examination that both he and Brown tried to manipulate each other. He admitted that he had previously stated that Brown "would jump off a building" if he asked her.
>
>> FN8 The appellant admitted, however, that this was the first time Trina Brown had revealed this fact. Her prior statements were contrary to this testimony. It is also contrary to her testimony that the appellant had told her on two separate occasions that he was going to murder and rob the next homosexual that propositioned him in order to raise money for their move to Florida. She apparently thought she could prevent the imposition of a death sentence by testifying in this manner. She admitted that she still loved the appellant and would do anything to help him. They continued to communicate with each other through letters and tapes.

8

State v. Hodges, No. 01-C-01-9212-CR00382, 1995 WL 301443, at *4 (Tenn. Crim. App. May 18, 2005) (emphasis added).

As to Dr. Harlan, Petitioner states that "Harlan's bias, prejudice, incompetence and fraudulent activities were not brought to light and available to Mr. Hodges until initial charges were brought in 2002 and proceedings were conducted before the Board of Medical Examiners in 2003." (Docket Entry No. 230, Petitioner's Supplemental Memoranda at p. 43 n.12).

Petitioner also filed six volumes of documents (Docket Entry Nos. 230 through 284) consisting of thousands of pages, but without any detailed analysis of those documents and their specific relevance to the evidentiary hearing. First, many of the documents, such as Petitioner's personal, medical, school and juvenile records, as stated earlier, were reviewed and relied upon by psychiatrists and psychologists in the State court proceedings. Those documents do not justify an evidentiary hearing. Some documents are of questionable probative value, e.g., a copy of Petitioner's 1980 doctor visit when he was 14 for an infection of his tonsils and adenoids, id. at Volume I at Exhibit 11, and documents of Trina Brown's parents' divorce proceedings that did not decide any relevant matters for Trina Brown. Id. at Exhibit 55. Much of the Petitioner's institutional records are not shown to have any apparent probative value to his claims in this action. The only different information on Petitioner's medical condition are the two affidavits of physicians discussed infra. Without detailed analysis of these massive materials to show their relevance on discovery and evidentiary issues, the Court considers the effect of these voluminous submissions that the Court had to search for possible relevance, is a delay of the proceedings.

Petitioner submitted affidavits by Dr. Murray Smith, an internist who specializes in drug disorders and Dr. George Woods, a psychiatrist. Id. at Volume II, Exhibits 4 and 5. In his one page

9

affidavit, Dr. Smith opines that Petitioner has a bipolar disorder and if retained, he would have recommended that counsel retain a psychiatrist. Id. at Exhibit No. 4. In his two page affidavit, Dr. Woods who has been evaluating Petitioner since 2004, opines that Petitioner has serious bipolar disorder and traumatic stress. Id. at Exhibit 5. Dr. Woods opines that Petitioner was unable or incapable of deliberating at the time of the murder and was unable to conform his conduct to the law because Petitioner had a severe emotional disturbance. Although Dr. Woods's affidavit references his two prior reports, those reports are not attached to his affidavit.

The record reflects that Petitioner has had numerous mental evaluations by psychiatrists and psychologists. In 1981, Dr. Joseph Fishbein, a psychiatrist, examined Petitioner, cited his drug use, and found a "conduct disorder", but did not diagnose Petitioner as having a bipolar disorder. Id. at Exhibit 12. Dr. James Campbell, a psychologist, did not find any "disturbance of psychotic proportion" but who found a "behavioral disorder of adolescence". Id. In 1981 Dr. Michael E. Slezah, a clinical psychologist found Petitioner to have impulsive behavior and "poor internal controls". Id. at Exhibit 13. In 1983, Dr. Ross Campbell, a psychiatrist opined that Petitioner had "all criteria of antisocial personality disorder" and was the "aggressive type with psychopathic tendencies." Id. A 1990 psychological assessment by the Georgia correctional psychologist diagnosed Petitioner with an Axis II Antisocial Personality Disorder. Id. at Exhibit 21 at p. 15. This report reflects Petitioner's statement that he "hates homosexuals-would go out seeking them and killing them". Id at p.46.

In 1992, prior to his trial, Dr. Leonard Morgan, a clinical psychologist evaluated Petitioner for the state court on whether Petitioner had a "diminished capacity." Dr. Morgan found that Petitioner's "intellectual ability is within normal range. There is no evidence of disorder of mood,

10

memory orientation or thought patterns." Id. at Attachment 14. As noted, Dr. Nurcombe, a psychiatrist for the defense at the sentencing hearing did not find any such bipolar disorder. Finally, Dr. Morgan and Dr. James Kyser, forensic psychiatrist evaluated Petitioner for the State. These doctors found Petitioner to have an antisocial personality, but he was not suffering from any mental illness or emotional disturbance and "was in complete control of his behavior." State v. Hodges, 944 S.W.2d 346, 351 (Tenn. 1997).

## 2. Conclusions of Law

Rule 6(a) of the Rules Governing Section 2254 Actions provides a good cause standard for discovery.

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

In Bracy v. Gramley, 520 U.S. 899, 908-909 (1997), the Supreme Court described the standard for good cause under Rule 6(a) as "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)) Accord Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004).

Petitioner argues that as an initial petition involving a death sentence, he is entitled to discovery to discern any constitutional violations in his conviction and sentence. If this were the initial proceeding, the Court is inclined to agree, but Petitioner has had two extensive proceedings in the state courts with opportunities for discovery. In addition, the law in this Circuit as stated in Stanford v. Parker, 266 F.3d 442 (6th Cir. 2001) is that there is not an automatic right to discovery.

11

Habeas petitioners have no right to automatic discovery. A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6. See Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); Byrd v. Collins, 209 F.3d 486, 515-16 (6th Cir. 2000). . . The burden of demonstrating the materiality of information requested is on the moving party. See Murphy v. Johnson, 205 F.3d 809, 813-15 (5th Cir. 2000).

The district court applied the correct legal standard in light of the evidence and the state court proceedings. The discovery sought by Stanford would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor. To the contrary, Stanford's requested discovery, when reviewed in light of the recently examined record, falls more in the category of a fishing expedition. We will not find that a district court erred by denying a fishing expedition masquerading as discovery.

Id. at 460.

"Conclusionary allegations are not enough to warrant discovery under Rule 6 of the Federal Rules Governing Section 2254 Petitions; the petitioner must set forth specific allegations of fact." Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994). In addition, discovery is unavailable "where undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." Williams v. Bagley, 380 F.3d 932, 976-77 (6th Cir. 2004) (quoting Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000). In this regard, the state courts' determinations of the facts are entitled to a statutory presumption of correctness, 28 U.S.C. § 2254(e)(l) and with certain exceptions, this Court's review is limited to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Discovery requests must also be considered in the context of 28 U.S.C. § 2254(e)(1) on the presumptive correctness of state court finding.

Because Petitioner failed to rebut the statutory presumption of correctness that the federal habeas court must award to the factual findings of the state courts, the district court properly concluded that it was required to defer to those factual findings.

Furthermore, given this conclusion, we would be hard-pressed to say that the district court abused its discretion in denying further discovery on these issues.

Byrd 209 F 3d at 516. See also Moen v. Czerniak, No. Civ 02-10-JE, 2004 WL 1293920 at *1 (D. Or. June 10, 2004) ("Discovery under Rule 6 must be considered in light of the provisions of 28 U.S.C. 2254(e)(2) which limit the scope of federal habeas corpus review to the state court record except [in] certain specified circumstances. . .").

Also relevant is consideration of the habeas petitioner's failure to utilize any available state discovery procedures. In Byrd, the Sixth Circuit stated:

> We find nothing in the record to indicate that Petitioner's counsel otherwise utilized the August 5th order or Ohio Rev Code § 149 43 to pursue further discovery. Counsel claims that, on an undisclosed date, he met with an employee of the Ohio Auditor of State to discuss a "Furtherance of Justice Account" and was informed that the Hamilton County Auditor's Office would have audit oversight responsibility for the prosecutor's disbursements from such an account. There is no indication whatsoever that, after receiving such information, counsel either attempted to obtain these records from Hamilton County or pursue a public records action.

209 F.3d at 507. As discussed infra, Tennessee law on post-conviction proceeding provide ample overview for discovery.

For Petitioner's request for an evidentiary hearing, in the Antiterrorism and Effective Death Penalty Act, ("AEDPA"), Congress redefined the standards for conducting an evidentiary hearing in a habeas action:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

13

28 U.S.C.§ 2254(e)(2).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court explained that if the petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the focus is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the matter:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts . . . Diligence for purposes of the opening clause [of Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.
>
> $*$  $*$  $*$
>
> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must to diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.
>
> $*$  $*$  $*$
>
> Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).
>
> As we hold there was a failure to develop the factual basis of this <u>Brady</u> claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused . . . upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.

<u>Id.</u> at 435, 437, 439-440.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary

14

hearing in a habeas action. Abdur'Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Id. at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing, but [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing on the applicant's constitutional claim." Id. (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exist, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to ADEA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold an evidentiary hearing," Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent authority to order a hearing [that] is still intact following Williams." Abdur'Rahman, 226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d 614, 626-27 (6th Cir. 2005).

Moreover, the Supreme Court and the Sixth Circuit have observed that: "The state court is

15

the appropriate forum for resolution of factual issues in the first instance, and creating incentives for the deferral of factfinding to later federal-court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Keeney, 504 U.S. at 9. Accord Byrd v. Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney, 504 U.S. at 9). More recently, the Supreme Court stated "[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it" Holland v. Jackson, 542 U.S. 649, 652 (2004).

After the conference with counsel, a review of the state court record and Petitioner's submissions, the Court concludes that Petitioner has not shown good cause for additional discovery. Petitioner contends that he was constrained in the state post-conviction proceeding by the trial court's failure to provide funding and adequate time for post-conviction counsel to prepare. This contention is without merit. First, Tennessee case law and statutes authorize discovery in state post-conviction proceedings. Under Tennessee law, Petitioner could have sought discovery, filed affidavits, taken depositions and requested subpoenas in the post-conviction proceeding. See Tenn. Code Ann. § 40-30-109. Under the habeas corpus statutes, a party can petition the presiding Court to issue subpoenas. Tenn. Code Ann. § 29-21-121(a). The availability of depositions in the state post-conviction proceeding is reflected in Strouth v. State, 755 S.W.2d 819, 827 (Tenn. Crim. App. 1987) ("In a deposition taken in 1982 for Dicks's post-conviction hearing, McMahan testified that he had been offered money and accepted the offer, because "[y]ou know, no man is going to turn down a thousand bucks to tell the truth").

Moreover, from 1992 to 1995, the Tennessee courts held that law enforcement files are subject to the Tennessee Public Records Act for disclosure and that attorneys could seek access to such files for clients with capital sentences in post-conviction proceedings. See Capital Case

16

Resource Center Tennessee, Inc. v. Woodall, No. 01-A-019104CH00150, 1992 WL 12217 at *5 (Tenn. Ct. App. Jan. 29, 1992). Although Woodall was later modified by statute in 1995, Waller v. Bryan, 16 S.W.3d 770, 774-75 (Tenn.Ct.App. 1999), Petitioner had this window of opportunity to review the State's files after his death sentence in 1992. With certain exceptions, FBI records are subject to disclosure under the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552(a) through(g).

As to Petitioner's contention of denial of necessary expert services in the state post-conviction process, first, "[t]here is no constitutional requirement that the State provide a psychiatrist for post-conviction proceedings." Deputy v. Taylor, Civ. A. No. 93-387 LON, 1993 WL 643368 at *5 (D. Del. 1993). Second, in 1995, the Tennessee Supreme Court rendered Owens v. State, 908 S.W.2d 923 (Tenn. 1995) that authorizes such funding in capital cases in post-conviction proceedings. As a matter of fact for Petitioner's trial and post-conviction proceedings, the state trial court authorized several experts to assist the Petitioner's counsel with one exception, the a physician specializing in drug addiction. The Tennessee courts found that Petitioner's drug use and history were factual matters that could be argued by counsel. Given the appointment of a psychiatrist and a psychologist, this Court deems the state court's ruling on this issue to be reasonable.

As to Petitioner's submission of medical evidence, Drs. Woods's and Smith's affidavits reflect their conclusions without any consideration of the facts of the murder, the findings of the state courts or the opinions of other psychiatrists who examined Petitioner throughout his life and at, or shortly after the murder. Such conclusory opinions do not warrant an evidentiary hearing and lack probative value. Any psychiatric evaluation of a habeas Petitioner's mental competence years after the critical events or "well after trial" "lack[s] the same relevance" as evaluations prior to trial. Harries v. Bell, 417 F.3d 631, 636 (6th Cir. 2005). In Harries, the Court ruled that notwithstanding

17

a "bipolar disorder" and "anxiety disorder", the habeas petitioner was competent for trial purposes based upon mental evaluations with different diagnoses prior to trial. Id. at 635, 636. Here, as outlined above, there were multiple evaluations of Petitioner prior to trial and prior to sentencing and none corroborate Dr. Woods's opinion.

Dr. Woods' opinion is wholly at odds with the facts of the murder, as described by Petitioner's girl friend and as found by the state courts. These facts reflect that Petitioner planned the murder and how he would commit the murder, announced his intentions, solicited a customer, went to the victim's house, handcuffed and taped the victim, went to get his girl friend and returned to murder the victim. Thereafter, the Petitioner took the victim's personal property, used his bank card, withdrew funds, commanded the victim's vehicle and later escaped to Georgia, where he planned and committed a second murder in a similar modus operandi. These facts clearly reflect the Petitioner's sustained deliberative plan and execution of his murder plan. Dr. Woods's failure to address any of these facts and his stated reliance upon Petitioner and his counsel for information deprives his opinion of any probative value as a matter of fact.

Petitioner submits the affidavits of his trial counsel that if they had had Dr. Woods's opinion about Petitioner having a bipolar disorder, then they would have gone to trial or presented this condition as a defense and as mitigation evidence. Several defendants in Tennessee with bipolar disorders have been convicted by jury trial, State v. Thacker, 164 S.W.3d 208, 219-20, 232 (Tenn. 2005); Morris v. State, No. W2005-00426-CCA-R3-PD, 2006 WL 2872870 *19-20, 22-23, 62 (Tenn. Crim. App. Feb. 26, 2007) (discussing and rejecting the opinion of Dr. Woods and others) and had their guilty pleas upheld. See e.g., Henderson v. State, No. W2003-01545-CCA-R3-PD 2005 WL 1541855 at ** 17-20, 37 and 47 (Tenn. Crim. App. Dec. 5,2005). See also United States v.

18

Moore, 180 Fed. Appx. 571, 573 (6th Cir 2006) (upholding sentence based upon a guilty plea of a defendant who had been diagnosed with bipolar disorder).

The Court has reviewed Brown's affidavit adopting her statement on the videotape as well as the videotape itself. Based upon that review and her demeanor on the videotape, her prior testimony at sentencing and the Tennessee appellate court's findings about Brown's credibility, the Court does not find Brown's videotaped statement to be credible so as to justify the additional discovery sought nor to hold an evidentiary hearing.

The critical issue with Dr Harlan is his opinion that the victim could have lived for up to five minutes after Petitioner started his strangulation of the victim. Here, Dr. Levy testified that he disagreed with that opinion. There is not any showing that any such questionable testimony or conduct of Dr Harlan occurred prior to the time of Petitioner's trial. The cited proof about Dr. Harlan involves events that occurred in 1995 that is three years after Petitioner's trial Because the questionable events did not come to light until 2002, long after Petitioner's trial, and despite discovery in the state courts and this Court, there is not any reason to conclude that the state prosecutors were aware of the conduct that required disclosure under Brady In any event, Brown who was present at the murder, testified at sentencing that about five minutes passed before the victim died. See infra at p. 45 Aside from Dr. Harlan's disputed testimony, Brown's testimony at sentencing constitutes a wholly independent factual basis for the jury's finding of an aggravating circumstance, in addition to the Tennessee court's ruling on the issue. Supra at p. 75 This contention does not merit additional discovery nor an evidentiary hearing.

On the necessity for an evidentiary hearing on Petitioner's claims about his trial and appellate counsel's performance, given the multi-volume transcript of the state post-conviction evidentiary

19

hearings as well as the expert services to assist counsel in those proceedings, the Court concludes that Petitioner had a full and fair hearing for his claims. As to matters that were not pursued in the state post-conviction hearing, Petitioner does not have a constitutional right to counsel in post-conviction hearings. Under <u>Ross v. Moffitt</u>, 417 U.S. 600 (1974) and <u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987) the right to counsel does not extend beyond the first appellate process. Thus, counsel errors in state post-conviction proceedings are not grounds for cause because there is no right to counsel for these proceedings. As the Supreme Court explained in <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991):

> [W]e decline[]. . . to extend the right to counsel beyond the first appeal of the criminal conviction. We held in <u>Ross</u> that neither the fundamental fairness required by the Due Process Clause nor the Fourteenth Amendment's equal protection guarantee necessitated that States provide counsel in state discretionary appeals where defendants already had one appeal as of right. . . . Similarly, in <u>Finley</u>, we held there is no right to counsel in state collateral proceedings after exhaustion of direct review. . . .
>
> Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel to appeal a state collateral determination of his claims of trial error.
>
> Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.

501 U.S. at 756-57. <u>Accord</u> <u>Ritchie v. Eberhart</u>, 11 F.3d 587, 591-92 (6th Cir. 1993) and 28 U.S.C. §2254(i) (codifying this principle).

The Court applies the same principle to the evidentiary hearing issue. If Petitioner's post-conviction counsel failed to pursue a matter, that omission could not be considered on the merits and

therefore, cannot justify an evidentiary hearing.

For these collective reasons, the Court concludes that Petitioner has not shown good cause for his discovery requests and his request for evidentiary hearing is not justified under the circumstances here

## II. Petitioner's Non-Defaulted Claims[2]

### A. Procedural History

On August 31, 1990, the Petitioner was indicted on charges of first degree murder, first degree murder during commission of a crime and aggravated burglary. In 1991, Hodges pled guilty in the Circuit Court of Davidson County, Tennessee, to first-degree murder and aggravated robbery. In 1992, after a sentencing hearing, and based upon the jury's findings of aggravating circumstance, the judge sentenced Hodges to death on the first degree murder charge and to a forty year sentence on the aggravated robbery conviction to be served consecutive to his death sentence. The Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Hodges, 1995 WL 301443 (Tenn. Crim. App. 1995). The Tennessee Supreme Court upheld Petitioner's death sentence. State v. Hodges, 944 S.W.2d 346 (Tenn. 1997).

Hodges filed his only state petition for post-conviction relief that the trial court denied. The Tennessee Court of Criminal Appeals affirmed the trial court's order denying the petition. Hodges v. State, No. M1999-00516-CCA-R3-PD 2000 WL 1562865 (Tenn. Cr.App. Oct. 20, 2000). The

---

[2]Given the Supreme Court's holding: "we hold that a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default," Dretke v. Haley, 541 U.S. 386, 394 (2004), the Court will decide first the merits of the non-defaulted claims.

21

Tennessee Supreme Court denied his application for permission to appeal on March 26, 2001.

## B. State Courts' Findings of Facts

In its decision, the Tennessee Supreme Court made the following factual findings[3] on the circumstance of the Petitioner's conviction

> The defendant, Henry Eugene Hodges, entered a guilty plea and was convicted of premeditated first-degree murder. Thereafter, the penalty phase of the trial commenced. The State presented proof of the circumstances of the offense through the testimony of Trina Brown, the defendant's fifteen-year-old girlfriend. Brown testified that one week before the murder she and the twenty-four-year-old defendant, who were living with the defendant's brother in Smyrna, Tennessee, decided to move to Florida. To get money for the move, Hodges, a male homosexual prostitute, told Brown that he would rob and kill the next person who propositioned him. Hodges discussed with Brown how the crimes would be carried out. Hodges repeated these statements on May 14, 1990, the day of this murder.
>
> On the night of May 14, Brown and Hodges went to Centennial Park in Nashville. When the victim, Ronald Bassett, approached, Hodges talked with him, and they left together in the victim's vehicle and went to the victim's residence at 3133A, Parthenon Avenue, across from Centennial Park. Ten or fifteen minutes later, Hodges returned to the park on foot, and along with Brown, drove back to the victim's residence in his own car. Hodges told Brown to lie down in the backseat of the car so no one could see her. When they arrived at the victim's residence, Hodges told Brown to wait in the car. After an unspecified period of time, Hodges returned to the car, wearing gloves, and asked Brown to come into the house. Brown testified that when she arrived, Bassett was lying face down on the bed in his bedroom with a pillow over his head. Hodges had bound his feet together with duct tape and had handcuffed his hands. While Bassett lay helplessly, Brown and the defendant ransacked the house searching for items of value. After obtaining the personal identification number for the victim's automatic teller card, Brown and the defendant "took a break," drank a coke, and discussed whether to kill Bassett. Brown testified that she told Hodges to kill Bassett to prevent their arrest. Hodges then went into the bedroom and, ignoring the victim's pleas not to kill him, strangled Bassett to death with a nylon rope. Brown testified that she heard Bassett moan and make a choking sound and that it took about five minutes for Bassett to die.

---

[3]State appellate court findings in its opinion can constitute factual findings under 28 U.S.C. § 2254(d). Sumner v. Mata, 449 U.S. 539, 546-47 (1981). The state court's other factual findings are set forth to correspond with Petitioner's specific claims.

Case 3:01-cv-00624   Document 312   Filed 03/28/08   Page 25 of 59 PageID #: 6580

In an attempt to remove any fingerprints, the defendant wiped off various items in the residence. After turning the air conditioner in Bassett's bedroom on high to prevent discovery of the body, Hodges and Brown left the victim's residence, taking the victim's automobile and several items of personal property, including jewelry, a gun, and a VCR. After using Bassett's automatic teller card to withdraw the twenty-four-hour maximum of four hundred dollars from his account, the pair returned to the house of the defendant's brother and went to bed. The next day, having learned that the victim's body had been discovered, Brown and the defendant abandoned the victim's car in rural Rutherford County and drove to Georgia in their own car. They were eventually arrested in North Carolina. Items of the victim's personal property were found in their possession at this time. Also, the defendant's fingerprints were found on items inside Bassett's home, and Brown had been photographed withdrawing money with Bassett's automatic teller card.

949 S.W.2d at 349-50.

As to the facts on Petitioner's sentencing, the Tennessee Supreme Court made the following

findings.

Testifying for the State at the sentencing hearing, Dr. Charles Harlan, the chief medical examiner for Metropolitan Nashville and Davidson County, confirmed that Bassett had died from ligature strangulation. Dr. Harlan opined that Bassett would have remained alive and conscious for at least three and perhaps as long as five minutes during the strangulation. Harlan also found abrasions on the victim's wrists consistent with handcuffs.

The State proved that the defendant had been convicted of armed robbery, attempted kidnaping and robbery in Hamilton County in 1984. The State also established that the defendant had been convicted of murder in Fulton County, Georgia, in July 1990. The record reveals that the Georgia killing occurred when the defendant and Brown arrived in Atlanta after murdering Bassett. Hodges made arrangements with a man to engage in homosexual acts for an agreed price. Hodges accompanied the man to his motel room, but when the man was unable to pay the agreed price, Hodges murdered him.

In mitigation, the defendant testified FN6 and also presented the testimony of his mother, his brothers and Dr. Barry Nurcombe, a child psychiatrist. This proof showed that the defendant was the next to youngest of his mother's five sons. His mother and father were not married. His father was actually married to another

23

woman, but engaged in what one of the witnesses described as an "irregular union" with the defendant's mother for eighteen years. The defendant's father abused the defendant's mother and was strict with the defendant's brothers, three of whom were the children of another man. The defendant, however, was his father's favorite and was spoiled. Financial difficulties forced the family to move about frequently, and defendant's father supported the family only sporadically.

> FN6 The defendant testified only about his personal history, particularly his alleged sexual abuse at age twelve. In this pre-<u>Cazes</u> proceeding, the trial court correctly limited the State to questions concerning personal history and did not allow cross-examination on the circumstances of the offense. <u>See</u> <u>State v. Cazes</u>, 875 S.W.2d 253, 264-267 (Tenn. 1994).

The defense introduced proof to show that Hodges seemed normal until he was twelve years old. At that time, he began to associate with older boys, sniff glue and gasoline, be truant from school, and run away from home. He also engaged in sexual activities with his younger brother and attempted sexual activities with a female cousin. He became involved with the juvenile authorities and was confined to a juvenile facility in Chattanooga.

Through his mitigation proof, the defendant attempted to establish that a catalyst and major contributing cause of his delinquent and later criminal behavior was his rape and sexual abuse by a stranger when he was twelve years old. According to the defendant, he accepted a stranger's offer of a ride home when he was playing a short distance from his home on Fessler's Lane in Nashville. Rather than driving Hodges home, the stranger drove Hodges to his home and raped him. Fearing rejection by his homophobic father and driven by guilt, the defendant told no one of this incident until he was arrested in 1990.

Dr. Nurcombe testified that, while the defendant suffered from an antisocial personality disorder, low self-esteem, and substance (marijuana) abuse, the killing was motivated by a subconscious desire for revenge for the sexual abuse inflicted on him when he was twelve, coupled with Hodges' fear that his family might discover that he was engaged in homosexual prostitution since Brown had told Hodges's sister-in-law shortly before the killing that he was a homosexual prostitute. The defense also introduced testimony that Brown dominated and manipulated the defendant.

In rebuttal the State called Dr. James Kyser, a forensic psychiatrist, and Dr. Leonard

24

Morgan, a clinical psychologist. Both had examined the defendant and concluded that he suffered from an antisocial personality disorder. They described persons with this disorder as having "no conscience," being "self centered," being "notoriously dishonest and untruthful," and having "very little regard for the feelings of others and ... willing to use any means to get what they want, no matter who it hurts." While acknowledging the complicated factors involved in antisocial personality disorders, the State's experts discounted the singular importance of the one incident of alleged sexual abuse in causing the defendant's actions. Dr. Morgan concluded that the defendant "was in complete control of his behavior" and not suffering from mental illness or emotional disturbance.

Id. at 350-51.

In Petitioner's earlier appeal, the Tennessee Court of Criminal Appeals's made other factual

findings on Petitioner's personal history and post-offense conduct at Petitioner's sentencing

When the appellant and Brown arrived in Atlanta, the appellant made arrangements with a man to engage in homosexual acts for an agreed price. They went to the appellant's motel room. When the person revealed that he did not have sufficient funds to pay the agreed price, the appellant murdered him. The appellant was subsequently convicted of murder in the first degree in Fulton County, Georgia, on July 31, 1990.

The state proved that the appellant had been previously convicted of robbery with a deadly weapon, simple robbery, and attempt to commit a felony, namely, kidnapping. The appellant was convicted of these offenses on January 26, 1984 in Hamilton County. The state also proved the conviction on July 31, 1990 for first degree murder in the Fulton County, Georgia case. This established the aggravating circumstance embodied in Tenn.Code Ann. § 39-13-204(i)(2).

The state also established that the murder was committed during the commission of a felony: robbery. As indicated, the victim was handcuffed and his legs taped, rendering him helpless. The appellant took several items of personal property from the residence. This established the aggravating circumstance embodied in Tenn Code Ann. § 39-13-204(i)(7).

The appellant presented evidence to mitigate his punishment for this murder. He presented evidence of his childhood, his family life, the sexual abuse he suffered when he was twelve years of age, his mental illness or disturbance, Brown's alleged

25

dominance of him, his immaturity, and his drug abuse.

*   *   *

According to family members, the appellant was his father's favorite. The appellant was never punished while his brother and two half-brothers were the subject of harsh punishment. If the appellant's mother punished him, his father would become angry at her. The appellant's mother and half-brother described the appellant as "spoiled." The half-brother stated that the appellant could do whatever he desired without fear of punishment.

The record reveals that the appellant lived a normal life until he was twelve years of age. When he reached this age, he refused to go to school, began to associate with older men, and started sniffing glue--anything that would make him "high." He frequently ran away from home and occasionally would stay away for weeks before returning home. Although the appellant's mother moved the family frequently, the appellant's lifestyle did not change. He was in custody of juvenile authorities on sixteen different occasions. While confined to a juvenile treatment facility in Chattanooga, the appellant escaped. He subsequently committed several serious offenses, which resulted in his convictions for robbery with a deadly weapon, simple robbery, and an attempt to commit a felony: kidnaping.

The appellant's maternal grandfather was an alcoholic. One of the appellant's half-brothers is a recovering alcoholic. The appellant has a history of abusing marijuana. He smoked as many as eight marijuana cigarettes in a twenty-four hour period.

The appellant testified that he was sexually abused by a complete stranger when he was twelve years old. However, he never revealed this abuse to any member of his family. Nor did he tell the juvenile authorities or the Tennessee prison officials that he had been sexually abused. The sexual abuse did not surface until he had been arrested for the Fulton County, Georgia murder. He related this to an official at the Georgia Diagnostic Center. The appellant refused to tell his parents about the sexual abuse because his father was homophobic and the appellant felt his mother would blame him for the occurrence. He did not tell the juvenile authorities because he knew they would tell his mother.

*   *   *

Shortly after the sexual abuse incident, the appellant made his brother perform fellatio on him. He took a young female cousin into a closet for the purpose of engaging in sexual conduct. When the murder occurred, he was living with Trina

26

Brown. He was also engaging in homosexual male prostitution.

* * *

The appellant's mother opined that fifteen-year-old Irina Brown completely dominated the appellant. Irina Brown testified that the appellant did not want to kill the victim and that it was she, not the appellant, who made the decision to kill the victim.FN8 She was afraid that if the victim was permitted to live, he would have the appellant arrested, and as a result, she would lose the appellant. Therefore, she told the appellant to kill the victim.FN8 The appellant admitted on cross-examination that both he and Brown tried to manipulate each other. He admitted that he had previously stated that Brown "would jump off a building" if he asked her.

> FN8 The appellant admitted, however, that this was the first time Irina Brown had revealed this fact. Her prior statements were contrary to this testimony. It is also contrary to her testimony that the appellant had told her on two separate occasions that he was going to murder and rob the next homosexual that propositioned him in order to raise money for their move to Florida. She apparently thought she could prevent the imposition of a death sentence by testifying in this manner. She admitted that she still loved the appellant and would do anything to help him. They continued to communicate with each other through letters and tapes.

Dr. Barry Nurcombe, a child psychiatrist, testified as an expert for the defense. He described the appellant as having an anti-social personality disorder. He outlined the appellant's family life, his childhood, the incident involving sexual abuse, his drug dependence, the murder, his relationship with Brown, his difficulty coping with stress, his poor judgment, which was aggravated by the use of marijuana, and other facts prior to expressing his professional opinion. He concluded that the appellant had a low self-esteem. He also concluded that although a grown man, the appellant reacts the same as a seven or eight-year-old child. He found that the appellant had established the rudiments of psychological disturbance prior to the incident involving sexual abuse.

According to Dr. Nurcombe, the appellant wanted revenge for the sexual abuse that he encountered in his childhood; and he viewed homosexuals as a class rather than individuals. Nurcombe related that Brown had told the appellant's sister-in-law the appellant was a homosexual. This was related by the sister-in-law to the appellant's half-brother, who confronted the appellant with this fact. Dr. Nurcombe opined that the stress resulting from this incident, coupled with the fear that the appellant's family might discover his homosexual lifestyle, motivated the appellant to kill the victim-the next homosexual that propositioned him.

27

The appellant told Dr. Nurcombe that "he did not wish to be thought [of as] crazy, that he felt that he did things deliberately [on the night in question, and] that any attempt to explain what he had done on psychological grounds was hogwash." The following colloquy occurred during Nurcombe cross-examination:

Q. Henry Hodges told you exactly why he killed Mr. Bassett but you think that you have a better grasp on why he did it than Mr. Hodges does, himself, is that correct?

A. Yes, I do.

The state called Dr. James G. Kyser, a psychiatrist, and Dr. James Morgan, a psychologist, in rebuttal. These two expert witnesses had examined the appellant for the state. Both experts had talked to the appellant on several occasions, reviewed certain medical records, and viewed an interview the appellant gave a television station concerning the murder and the appellant's background.

Dr. Kyser concluded that the appellant had an anti-social personality disorder. He stated that people with this disorder have "no conscience", are "self-centered," are "notoriously dishonest and untruthful," "have very little regard for the feelings of others," and are willing to use any means to get what they want, no matter who it hurts, and they "know how to work the system real well." The appellant "essentially meets all [these] criteria."

Each time Dr. Kyser talked to the appellant about the Bassett murder, the appellant would contradict what he had previously stated during interviews. Dr. Kyser explained that his evaluation of the appellant was necessarily predicated upon what the appellant told him. Due to the many contradictions related by the appellant, Dr. Kyser did not believe him. Dr. Kyser stated: "[H]e is at high suspicion for being untruthful; for, in fact, lying, malingering, [and] attempting to distort the truth." He stated that Dr. Nurcombe's psycho-dynamic theory is not universally accepted by other psychiatrists.

Dr. Morgan also concluded that the appellant had an anti-social personality disorder. According to Dr. Morgan, one episode of sexual abuse, as in this case, will not cause a person to have an anti-social personality disorder. He concluded that the appellant was in complete control of his behavior when he murdered the victim.

28

1995 WL 301443 at **2-5 (some footnotes omitted).

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions " as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Moreover, the Supreme Court stated that under the "unreasonable application" clause, a state

29

court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

The Court addresses the merits of the non-defaulted claims, but combines related claims.[4] The Court also considers Petitioner's ineffective assistance of counsel claims first as the resolution of that claim could preclude considerations of other claims.

### 1. Ineffective Assistance of Counsel Claims

Petitioner's claim 9 that is 15 pages in length, alleges ineffective assistance of his counsel at trial based upon his trial counsel's inadequate investigation and preparation before his plea and

---

[4] The number for Petitioner's claims correspond to the numbered paragraphs in the First Amended Petition. The Court has also tried to group related claims.

30

at sentencing. (Docket Entry No. 32, Amended Petition at pp. 5-20). Petitioner also cites his counsel's ineffectiveness on appeal for their failure to raise the claims in this petition. Id. at pp. 19-20. Aside from trial and appellate counsel, Petitioner also cites the State's inadequate compensation of appointed counsel. A related claim is claim 32 that Petitioner's guilty plea was not knowingly, intelligently and voluntarily entered. Id. at p. 37.

### a. Ineffectiveness of Trial Counsel

As to the ineffectiveness of Petitioner's trial counsel, the Tennessee Court of Criminal Appeals made the following factual findings.

> Attorneys Donald Dawson, Michael Terry and Brock Mahler were appointed at the trial level to represent the appellant in this case. Since his appointment in 1996, Dawson has held the position of Post-Conviction Defender for the State of Tennessee and represents capital case petitioners in state post-conviction and federal habeas corpus proceedings. See Tenn. Code Ann. § 40-30-302 et seq. (1997). Prior to his appointment, he was in the private practice of law in the areas of employment discrimination and criminal defense. Dawson also had previous work experience with both the federal and state public defender's offices. He had tried one other capital case prior to his appointment to the appellant's case. Dawson stated that he represented the appellant both at the trial level and on appeal, although he conceded that he had a minor role in the appeal.

> At the time of Dawson's appointment to this case in February 1991, he was involved in a "major [federal] tax criminal case in Memphis." He advised the trial court of his involvement in the federal case and that it would not be prudent for him to accept appointment. The trial court informed Dawson that the appellant was incarcerated in Georgia and would not be returned to Nashville until July or August. The appellant was returned to Tennessee custody some time in April. Because of his involvement in the federal case in Memphis during this time, Dawson was unable to do any substantive work in the appellant's case. In fact, Dawson recalled that he did not "file any motions or begin actual work on the case until after [he] returned from Memphis."

> Dawson testified that the law firm he was with at the time of his appointment had dissolved and, in August 1991, he had joined another law firm. The pressure to generate fees at his new firm highly impacted the amount of time he devoted to the appellant's case. He related that he primarily worked on the appellant's case outside of his regular practice, on the weekends and evenings. He admitted that he should not

31

have accepted appointment to the appellant's case because his financial concerns impeded his ability to work on the case. Notwithstanding, Dawson stated that he began working "in earnest" on this case in late September or early October 1991. Until this time, the defense team had not developed any defense theory of the case. Dawson stated that developing a strategy was frustrated by the appellant's public confession to eight murders.

*  *  *

In making the decision to enter a plea of guilty to the charge of first degree murder, Dawson testified that neither he nor anyone else associated with the defense traveled to Georgia, where the appellant was incarcerated, or North Carolina, where the appellant was arrested, in order to undertake a factual investigation. He explained that the defense team did not have adequate time to conduct such investigations. Additionally, he admitted that the defense team did not file a motion for funds to travel to Georgia and North Carolina, a motion for funds for a fingerprint examiner, a motion to suppress evidence, or a motion for a forensic pathologist to assist in the cross-examination of the State's medical expert. Dawson did admit, however, that the defense team did present a challenge to the medical examiner's testimony in its motion for new trial. Specifically, the medical examiner had testified that the victim would have been rendered unconscious three to five minutes prior to death; the defense team subsequently learned that a person would lose consciousness in thirty seconds.

Dawson testified that, over the weekend preceding the scheduled trial, the defense team determined that the "guilt-innocence phase [was] hopeless. That there was no way we were going to convince anybody that Mr. Hodges didn't kill the victim in this matter." The defense team concluded that, in order to gain credibility with the jury at the sentencing phase, the better strategy would be to plead guilty. In hindsight, Dawson related that had they proceeded to trial at the guilt phase, they would have been able to "begin to introduce [their] mitigation theories." He admitted that he "had not done the sort of serious legal research that should have been done on an issue like that." Dawson stated that he was only being compensated $20-$30 per hour in-court to represent the appellant. He admitted that this meager compensation was considered in the defense strategy. Another factor in the decision to plead guilty was the intent to surprise the State so they would not be able to introduce as much proof at the sentencing phase.

Dawson spent 228.1 out-of-court hours and 58 in-court hours on this case, however, he did not believe that this was sufficient. He further stated, though, that he probably spent more time on the case than he billed. According to Dawson, Mahler spent well over 300 hours working on this case prior to trial. Mahler was employed by the Capital Case Resource Center and, therefore, did not receive any reimbursement from

32

the courts for his work on this case.

Dawson admitted on cross-examination that the defense team had filed a bill of particulars in this case and approximately fifty motions. He also filed numerous special requests for jury charges. He conceded that the attorneys had a good working relationship with the appellant. He admitted that the proof of the appellant's guilt was overwhelming, *i.e.*, the appellant had made numerous public statements as to his culpability; his fingerprints were found at the scene; personal belongings of the victim were located in the appellant's possession at the time of his arrest; and the appellant's girlfriend had provided a statement implicating the appellant. He acknowledged that the decision to plead guilty was a tactical decision, although, as he explained, entered without sufficient investigation and preparation.

Dawson stated that the appellant commended the defense team and thanked them for their representation. He added that the appellant never complained at any time regarding counsel's representation. At one point in the appeal process, the appellant indicated that he wanted to withdraw his appeal and be executed, however, Dawson and Terry convinced him to pursue his appeal. Dawson concluded by stating,

> my feeling is that we failed in some fundamental ways to properly protect Mr. Hodges. That, you know, we clearly, obviously from the result, we didn't convince the jury of the mitigation or the weight of the mitigation that we presented. And I believe that there is, there are things that we should have done in terms of additional investigation that would have made that mitigation case stronger, to the extent that we had a duty to do those things and to prepare the mitigation, to come up with a more, I guess, compelling theory. Not theory but manner in which we presented the case, this would be through putting it on as a guilty-innocence case first. Then starting out mitigation, there and continuing it into the sentencing phase, that we failed in some fundamental ways that had we done sufficient legal research and investigation, we would not have made those errors. ..

> Michael Terry was appointed to represent the appellant in April or June 1991. At the time of his appointment, he had tried one capital case to conclusion and was involved in another exhausting capital case which was tried for three weeks in July 1991.

Terry stated that after the appellant was returned to Nashville, he started giving interviews to the local news stations describing himself as a serial killer. Terry advised the appellant to stop giving interviews. Notwithstanding these initial consultations, Terry stated that he did not actually start working on the appellant's case until August. The appellant's trial began in January 1992. Terry concluded that

33

the period from August to January was insufficient time to prepare for trial. He stated that in order to effectively represent a defendant charged with a capital crime, he would need to devote six months solely to that case. Indeed, he stated that anywhere between 1500 and 1800 hours are "required to be effective in [capital] cases. And short of that is not effective representation." He claimed that he spent 256 out-of-court hours and 69.5 in-court hours for his work on this case. Terry explained that, during this time, the fees paid to appointed counsel representing indigent appellants resulted in a financial strain for himself. He stated the $20 per hour paid in appointed cases for indigent defendants was "not going to get you effective assistance in this kind of case."

* * *

Regarding the appellant's entry of a guilty plea, Terry admitted that the decision was made the week prior to trial. He stated that the decision was, in part, to be a demonstration of remorse for the jury. Reflecting upon this decision, Terry opined that pleading guilty was a mistake for several reasons. Expounding upon this conclusion, Terry testified that they surprised the court, the prosecutor, and the jury by pleading guilty. He explained that they should have at least "pitch[ed] a fight."

2000 WL 1562865 at **4-5, 6-7, 8 (some footnotes omitted).

The Tennessee Court of Criminal Appeals addressed Petitioner's claim about the validity of

his guilty plea and upheld his guilty plea that was supported by effective assistance of his counsel.

The appellant claims that trial counsel were ineffective by deciding to plead guilty rather than proceed to trial. He maintains that the advice constituted deficient legal representation that resulted in severe prejudice. Additionally, he contends that the "hasty" decision to enter the plea effectively "destroyed their credibility with the jury." He argues that the decision was made absent (1) any consideration of the pros and cons of pleading guilty; (2) any research into the ramifications of pleading guilty in a capital case; and (3) any consultation with third party attorneys on the matter.

At the post-conviction hearing, Dawson testified that the decision to enter a guilty plea was made the weekend prior to trial when it was determined that "there was no way we were going to convince anybody that Mr. Hodges didn't kill the victim in this matter." He explained that, at that time, the defense team believed that by entering a plea during the guilt phase of the trial, they would gain credibility with the jury for the sentencing phase. The defense team also hoped to surprise the State by entering the plea. In essence, the defense team intended to disrupt the bifurcated nature of the trial, thereby precluding the State from introducing evidence during the penalty phase which the State had planned to introduce at the guilt phase. Notwithstanding this reasoning, Dawson admitted that, although the proof was overwhelming, in

34

hindsight, they should have proceeded to trial so that they could have begun introduction of their mitigation theories. Michael Terry corroborated Dawson's testimony regarding the appellant's guilty plea. He explained that the plea was supposed to be "a demonstration of remorse for the jury." However, he agrees that the decision was a mistake and that they should have at least "pitched a fight." The appellant did not testify at the post-conviction hearing. Other than his attorneys protestations of ineffectiveness at this level, there is no other evidence that the appellant's guilty plea was not knowingly entered. The post-conviction court concluded that counsel made an informed tactical decision in advising the appellant to enter the guilty plea.

\* \* \*

Although it is true that the appellant ultimately gained nothing by pleading guilty, the record persuasively demonstrates that the appellant had little to gain by insisting upon a trial. It is undisputed that the evidence against the appellant was overwhelming and that his chances of acquittal were virtually non-existent. Indeed, in advising the appellant, defense counsel was faced with two options: plead not guilty to the indictment and face a full trial; or plead guilty to the indictment and face limited evidence in a sentencing hearing with an opportunity to trade on his acceptance of his guilt and remorse. Confronted with the overwhelming evidence of the appellant's guilt, defense counsel advised the appellant to plead guilty in the reasonable hope of obtaining leniency during the sentencing phase. Defense counsel reasonably believed that the jury would view the appellant's guilty plea as an expression of remorse warranting a less severe sentence than that imposed upon a defendant who protests his innocence in the face of overwhelming evidence of guilt. Moreover, by pleading guilty, the appellant eliminated the presentation to the jury of all of the evidence available to establish the appellant's guilt of the murder. The hard callous facts behind the offenses, in essence, were desensitized by avoiding the guilt phase. The absence of an in-depth recitation of facts enabled the appellant to seek some sympathy from the jury in the face of mitigating evidence.

Viewing from counsel's perspective at the time the advice was rendered to the appellant regarding the decision to plead guilty, we must reject the claim that such advice was outside the range of competence demanded of attorneys in criminal cases. ... Although defense counsel's strategy for avoiding the death penalty was thwarted, the decision to pursue that particular strategy cannot be deemed incompetent. Given the overwhelming evidence of guilt, the advice of counsel regarding the appellant's decision to plead guilty cannot be faulted in hindsight. The courts must exercise substantial restraint before interfering with the attorney-client relationship and the matter of strategy and tactics. See Holland v. State, 761 S.W.2d 307, 320 (Tex.Crim.App. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1560 (1989) (citation omitted). Such an inquiry should only be made where it does not appear that there exists any plausible basis in strategy and tactics for the particular act or acts by

35

counsel. Id. Errors in trial strategy do not generally establish incompetence. Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065; see also McMann v. Richardson, 397 U.S. at 770, 90 S.Ct. at 1448 ("that a guilty plea must be intelligently made is not a requirement that all advice offered by defendant's lawyer withstand retrospective examination in a post-conviction hearing."). Moreover, we acknowledge that a defendant is entitled to competent, not perfect, representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn.Crim. App. 1996). Accordingly, after review of the record, we cannot conclude that counsel's recommendation to the appellant to plead guilty constituted incompetent advice. This issue is without merit.

2000 WL 1562865 at **18, 20-21 (emphasis added).

The Tennessee appellate court rejected Petitioner's claim that his trial counsel's performance

on the finger print issue as deficient for lack of prejudice

> The appellant contends that counsel was ineffective by failing to seek an independent fingerprint examiner to review the conclusions drawn by the States' examiners, failing to evaluate the procedures used to lift and preserve the latent print, and failing to identify or eliminate unknown latent prints found in the victim's residence. The appellant further claims that he was precluded from demonstrating prejudice due to the post-conviction court's denial of funds for the fingerprint expert.

> This claim focus upon a latent fingerprint lifted from the unicorn glass globe found in the victim's residence. A latent fingerprint examiner employed by the Metro Police Department examined the latent print and compared this print to known prints of the appellant. The prints were identified as those of the appellant. Trial counsel did not have an independent fingerprint expert review the conclusions drawn by the State's examiners nor did they challenge the procedures used to lift and preserve the latent prints.

> The post-conviction court denied post-conviction counsel's motion for funds for a fingerprint expert. Thus, no testimony was presented to explain the failure to request a fingerprint expert. Notwithstanding, given the nature of the case, we presume a threshold finding of deficient performance regarding counsel's failure to investigate the State's expert's findings. However, the appellant has not demonstrated how he was harmed by counsel's failure to request the services of independent experts. See Black, 794 S.W.2d at 757. As noted by the post-conviction court in its denial of funds, the qualifications of the State's experts were not challenged and there is no allegation of bias. See infra.

> What is more important, however, is the effect of the appellant's guilty plea. Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In other words, although some pre-plea

action or inaction of counsel may have been deficient, in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 370 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn.Crim.App. 1997). The appellant has failed to show how such an attack on the fingerprint evidence would have altered his decision to plead guilty. The proof does show, however, the overwhelming evidence of the appellant's guilt irregardless of the fingerprint evidence.

Id. at **17-18

As to the claim that earlier intervention by counsel would have prevented Petitioner from giving inculpatory interviews with the media, the post-conviction court found that:

> [t]he petitioner is a person who craves attention. Even after his return to Nashville and conferring with counsel he continued to write letters and give interviews. There is no proof that earlier intervention by counsel would have prevented the petitioner from making these inculpatory disclosures to the press or government officials.

Id. at *21.

As to the systemic deficiencies in Tennessee's system of providing counsel, the Tennessee Court of Criminal Appeals found:

> The appellant next claims that the systemic deficiencies in the indigent defense system of the State of Tennessee render any indigent capital defendant's Sixth Amendment right to effective counsel a nullity because it forces the court-appointed attorney to choose between the defendant's right to effective representation and the attorney's right to earn a living. In other words, he asserts that the fee structure afforded counsel for indigent capital defendants in this state necessarily denies him effective representation by counsel due to counsel's lack of devotion to his case. Particularly, the appellant supports his claim by referencing counsel's lack of involvement in his case upon initial appointment. Indeed, he asserts that had counsel maintained more contact with the appellant upon their appointment, they could have prevented him from making inculpatory statements to the media and they could have further investigated his case. He explains that had counsel received greater compensation, they would have been willing to devote more time to his case.
>
> The appellant's claim that the court-appointed compensation scheme created a financial disincentive to provide competent, quality representation in this case is belied by the record. By their own account, each attorney expended more than 300 hours on the case. The hired investigator/mitigation expert spent at least 150 hours

on the case.

*   *   *

The Court further discounted any inherent ineffectiveness resulting from the compensatory schedule of appointed counsel for capital indigent defendants, finding:

> . . . [g]iven the amount of time spent by counsel in preparation for the 1992 trial, this could not be the case. There is no proof in this record that if trial counsel had been paid more, that they would have done more. The testimony on this issue was amorphous and vague. Sure, counsel would have liked to be paid more, but the fee structure did not deprive this petitioner for effective representation.

*   *   *

> A blanket claim that the fee schedule established for counsel appointed in indigent capital defendant cases in Tennessee does not suffice to meet the burden. Thus, we decline to hold that the out-of-court fee schedule applied to private attorneys appointed to represent indigent capital defendants necessarily renders any representation ineffective because of the financial burden on counsel.

Id. at **21, 22 (emphasis added).

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. In Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003), the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

> . . . the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In Williams, the Supreme Court confirmed the vitality of this "per se"

38

approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S Ct 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F 3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial)

325 F.3d at 740.

Within the first category are three types of presumptive ineffectiveness of counsel:

The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S Ct 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U S at 659, 104 S Ct 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

Where a habeas petitioner pled guilty, the Supreme Court defined the standard for ineffective

assistance of counsel claims in that context:

The focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity. A state prisoner must, of course, prove that some constitutional infirmity occurred in the proceedings. But the inquiry does not end at that point, as the Court of Appeals apparently thought. If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, supra, 397 U.S. at 771. Counsel's failure to evaluate properly facts giving rise to a constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations meet this standard of proof. Thus, while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief.

We thus reaffirm the principle recognized in the Brady trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal

process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann.

A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry. And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, McMann, supra, it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered possible constitutional infirmity in the proceedings.

The principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, see Brady v. United States, supra, 397 U.S. at 751-752, or by contesting all guilty, see Santobello v. New York, 404 U.S. 257 (1971). A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement... might be factually supported.

Tollett v. Henderson, 411 U.S. 258, 266-68 (1973) (emphasis added)

"'The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case.' Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996) (citation omitted). "A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable." Id. (quoting ABA's Model Code of Professional Responsibility, Ethical Consideration 7-7 (1992)) (emphasis in the original). In this Circuit, a defendant "is entitled to the benefit of his attorney's superior experience and training in

40

criminal law," to provide the defendant with a meaningful basis for deciding whether to accept a plea

offer. Smith v. United States, 348 F.3d 545, 553 (6th Cir. 2003).

> In Smith, the Sixth Circuit elaborated on counsel's obligations in the context of a guilty plea.

> The decision to plead guilty--first, last, and always--rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

> On the other hand, the attorney has a clear obligation to fully inform her client of the available options. We have held that the failure to convey a plea offer constitutes ineffective assistance, see Griffin, 330 F.3d at 734, but in the context of the modern criminal justice system, which is driven largely by the Sentencing Guidelines, more is required. A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time. The criminal defendant has a right to this information, just as he is entitled to the benefit of his attorney's superior experience and training in the criminal law.

348 F.3d at 552-53 (emphasis added).

Here, Petitioner's trial counsel had a bill of particulars, filed 50 pretrial motions and prepared

numerous proposed jury instructions. Petitioner's trial counsel's were experienced in capital cases.

Petitioner's counsel were clearly aware of the State's proof that they described as "overwhelming"

and knew the elements of the offense. Petitioner's counsel had the aid of three experts. Petitioner's

trial counsel's trial strategy was impaired by Petitioner's public statements and interviews admitting

to several murders, notwithstanding his counsel's advice. 2000 WL 1562865 at *7. Given these

circumstances, Petitioner's counsel made a strategic decision to recommend a guilty plea and

Petitioner agreed to plead guilty. These strategic advantages were to demonstrate Petitioner's

41

remorse and to limit the proof that the State could introduce. Id. at **6, 8.

The state trial and appellate courts found that given the State's "overwhelming" proof of Petitioner's guilt and defense counsel's investigation that was aided by experts, Petitioner's trial counsel's strategic decision to advise Petitioner to plead guilty was a reasonable tactic. This strategy sought to show Petitioner's remorse and to limit the State's proof and thereby avoid the death penalty. Petitioner has never testified that his plea was involuntary and uninformed. This Court concludes that in the context of a guilty plea, the state trial and appellate courts' rulings that Petitioner's trial counsel made a reasonable strategic decision to advise Petitioner to plead guilty are reasonable.

Aside from the reasonableness of counsel's performance, Petitioner must also establish prejudice from counsel's performance at the guilt stage. In Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court further adduced the prejudice element for ineffective assistance of counsel in the guilty plea context.

> We hold, therefore, that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in Tollett v. Henderson, supra, and McMann v. Richardson, supra. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will

42

depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. See, e.g., Evans v. Meyer, 742 F.2d 371, 375 (7th Cir. 1984) ("It is inconceivable to us . . that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received"). As we explained in Strickland v. Washington, supra, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." Id., 466 U.S., at 695.

Id. at 58-60 (emphasis added and footnotes omitted).

Here, as to trial counsel's advice to plead guilty, there is not any evidence to suggest that Petitioner would have gone to trial on that the outcome or that the finding of Petitioner's guilt would be different. Petitioner never testified in the state post-conviction hearing that his guilty plea was uninformed or involuntary or false or he would have gone to trial. As found by the state courts, there was overwhelming evidence of the Petitioner's guilt. Thus, the Court concludes that Petitioner has not shown the requisite prejudice for this aspect of his claim.

### b. Ineffectiveness of Counsel at Sentencing

As to Petitioner's trial counsel's work at the sentencing phase, the Tennessee Court of Criminal Appeals cited Petitioner's proof:

> Dawson testified that Brock Mahler came on board as third counsel in the case. Mahler was responsible for working on mitigation issues and psychological issues. Not only was this Mahler's first capital case, but also his first trial of any kind. Preparation on the mitigation theory began in October after the trial was scheduled for the later part of January. Dawson testified that this was not sufficient time to prepare a persuasive mitigation defense. Specifically, since the defense relied primarily on the appellant's own statements, *i.e.*, he had been kidnaped and raped by a homosexual male when he was an adolescent, there were numerous persons that needed to be interviewed to corroborate these statements. There was no attempt to try to obtain records from the Georgia Diagnostic Center which would have provided corroboration in that the appellant related this rape incident to a doctor in the Georgia

43

penal system. Additionally, there was no attempt to obtain the statements of individuals who could have confirmed a change in the appellant's character and behavior at the time of the rape. Notwithstanding, the defense team did interview Dr. Nurcombe, the appellant's mother, his brothers, and one person in the community. Dawson admitted that these witnesses testified and helped establish the change in the appellant's behavior; additionally, he noted that "juries rely a lot more on lay witnesses than they do on professional witnesses." He stated, however, that additional witnesses "would have made it more real to the jury." Dawson confirmed that it was important for the purpose of establishing credibility to have obtained this information.

Dawson emphasized the mistake of relying solely on a psychiatrist, rather than hiring the services of a mitigation consultant. He explained that a mitigation consultant considers the fields of sociology, psychology, and other related areas in processing information about a defendant to establish a complete portrayal of the subject's life. Additionally, Dawson took responsibility for the court's denial of the defense motion for funds for a drug and alcohol expert.

\* \* \*

Terry testified that he cross-examined Dr. Harlan during the sentencing hearing. Terry conceded that he had never talked with Dr. Harlan until immediately prior to his testimony at the sentencing hearing and admitted that he should have been more prepared for Dr. Harlan's testimony. He explained that he did not question Dr. Harlan prior to trial because "[w]e didn't think that there was any issue about the cause of death. And we did not anticipate that Harlan would exaggerate that time to four minutes." Notwithstanding, Terry elicited from Harlan on cross-examination that it was possible that the victim was conscious for less than three minutes. Moreover, at the motion for new trial, the defense team unsuccessfully attempted to attack the veracity of Dr. Harlan's testimony based upon evidence that the victim would not have been conscious for more than 30 seconds. Terry admitted that he was prepared; he should have vigorously cross-examined Harlan; he should have interviewed him prior to trial; and he should have obtained a forensic pathologist to rebut Harlan's testimony.

\* \* \*

When Brock Mahler was appointed as the third attorney in this case, he was employed as a staff attorney by the Capital Case Resource Center. He officially began working with the defense team in November although he had been consulted in October. Mahler testified that he initiated the investigation regarding mitigation evidence. Mahler testified that Susan Canon had been retained as the mitigation investigator in this case; specifically, she had been approved as of September 9th. Mahler explained, however, that it was not until the end of October when Mahler personally brought Canon to meet the appellant that an initial interview was conducted. A short time thereafter, Canon informed Mahler that she had to withdraw from the case. Ann

44

Charvet was then contacted as a substitute for Canon. Although the mitigation investigator did spend roughly 77 hours preparing for this case, Mahler stated "[t]hat's laughable. Typically a mitigation investigation is in excess of 300 hours." Thus, as of November, nothing had been done on the appellant's case except that an evaluation by a mental health expert had been performed and the defense team had obtained some of the appellant's hospitalization records. Mahler testified that two months was not enough time to thoroughly prepare for trial. Although Mahler believed that they had a fairly compelling psychiatric explanation, they needed to introduce more law and expert witnesses to buttress their story before the jury. Mahler testified that, if he had more time, he would have involved Dr. Pamela Auble, who had evaluated the appellant, as a witness. He also mentioned that Dr. Ken Anchor, who had evaluated the appellant as a juvenile, should have been a witness, as he could have corroborated the fact that the appellant did show symptoms of a person with at least a sexual identity disorder. Mahler stated that a drug and alcohol expert was necessary as well as a social worker. Mahler admitted that motions for continuances were sought, but denied.

Regarding the penalty phase of the trial, Mahler testified that he was to deal with the psychiatric proof; Dawson was to deal with lay witnesses and direct examination; and Terry was to deal with cross-examination of the State's witnesses. Despite this plan, Mahler felt that the defense team was not integrated. Dawson and Terry were pulled from their private practices; so most of the work was done on the weekends. Mahler testified that he had urged Terry to be prepared to cross-examine Dr. Harlan, including "bon[ing] up on some medical treatises..." Mahler opined that Terry "needed to inform himself about the medical aspects of ligature strangulation to be prepared to cross-examine Dr. Harlan." In fact, Mahler stated that an independent forensic pathologist should have been consulted to rebut Dr. Harlan's opinion regarding the length of time the victim remained conscious. Mahler attempted unsuccessfully to challenge Dr. Harlan's testimony in the motion for new trial. Indeed, Mahler testified that there was information to support the defense's position that consciousness could not have lasted as long as Dr. Harlan testified. Specifically, Mahler stated that there was an affidavit by Dr. Sperry stating that loss of consciousness would have been very rapid and there was testimony from another case where the defense had effectively cross-examined Dr. Harlan as to ligature strangulation.

Mahler took issue with the appellate court's opinion that the "heinous, atrocious, cruel" factor focused upon "mental torture because the victim was helpless." Mahler stated that he never got that impression. Rather, Mahler testified that he was of the opinion that "Mr. Bassett was involved in being robbed. One does not presume in the course of a robbery that one is going to be killed." He further criticized the Court of Criminal Appeals' opinion, concluding its findings inconsistent because Mr. Bassett had a pillow over his head and was in another room. Mahler noted that, given these facts, the victim would not have been able to overhear what the appellant and Brown were planning to do with him.

45

Mahler estimated that he spent about 500 hours on this case, including both trial and appeal preparation. Additionally, he testified that, in his opinion, Dawson and Terry's "performance was certainly deficient." He explained that they did not do anything on this case until "just near the end"; "[t]hey relied on [Mahler] to prepare this case for them."

* * *

David J. Keefe, chief counsel with the capital division of the Tennessee District Public Defender's Conference, reviewed the representation provided by counsel in the present case and testified on the appellant's behalf at the post-conviction hearing. Based on his review, Keefe opined that the appellant's attorneys were deficient in their representation of the appellant. He suggested that the attorneys should not have accepted appointment unless they were able to devote all or a substantial portion of their time to the matter. He further opined that the attorneys should have designated one person to serve as lead counsel to lend direction to the preparation and trial of the case. According to Keefe, the appellant was prejudiced by counsel's lack of involvement early in the case when the appellant gave interviews to the media without first being consulted by counsel. The jury never heard these statements provided to the press, however, Keefe believed the appellant was prejudiced just the same because the lawyers may have made the decision to plead guilty in part due to the fact that these statements were potentially available for introduction at trial. Keefe also believed the decision to plead guilty was wrong and hastily made. He opined that, by pleading guilty, the defense team confused the jury and lost an array of appellate issues. Keefe further criticized the defense team as developing their sentencing theory backwards. Specifically, he stated that the defense team should have investigated the facts and the appellant's background before they came up with a psychological theory to tell the jury instead of trying to adopt a theory and then fill in the holes. He also emphasized the defense team's ineffectiveness by not attempting to rebut the State's theory that the victim remained conscious for three to five minutes during the strangulation.

* * *

Julie Hackenmiller, a mitigation specialist with Inquisitor, Inc., was retained by the appellant for the post-conviction proceeding. Hackenmiller was responsible for performing the social history and assessments on the appellant's case. Inquisitor, Inc. began collecting the appellant's records and locating witnesses in June 1998; by August 1998, Hackenmiller was given primary responsibility for the mitigation investigation. At the time of the post-conviction hearing, Hackenmiller stated that her investigation was not complete and she needed additional time to complete her social history and assessment of the appellant. Although she received the appellant's high school records, she had not yet received prison records from Georgia or Florida, despite making several requests. She stated that she requested that post-conviction counsel subpoena these records in August 1998. She further testified that she needed

46

more time to interview one of the appellant's school principals regarding teasing by other students endured by the appellant.

Hackenmiller also identified other mitigation themes that were not explored during trial. Specifically, she related that the appellant's mother had an extremely abusive childhood and background. Both her father and her husband were extremely abusive. His mother, as well as other maternal family members, had been diagnosed as mentally ill. Specifically, the appellant's mother had previously suffered a "nervous breakdown," and "she has been diagnosed as bipolar and post-traumatic stress disorder." In furtherance of this avenue, Hackenmiller obtained a release from the appellant's mother for her medical records. Notwithstanding, she had not yet received the records as of the hearing date. Additionally, she discovered that the appellant had a great deal of trouble as a juvenile. He had a substance abuse problem and had an "extremely little social support system to turn to." In her attempt to contact members of the appellant's family, Hackenmiller was frustrated by the appellant's mother's endeavor to thwart the interviews. In essence, Hackenmiller stated that the family's attitude was "uncooperative." She attributed this to the "extreme abuse [experienced by the appellant and his family] by the members of the press." Despite the family's current position, Hackenmiller believes that she will be able to establish rapport with the mother so that she will eventually be able to interview the brothers.

Hackenmiller reported that the appellant's maternal grandfather, an alcoholic, was "an extremely violent, physically and sexually abusive individual." The appellant's mother was addicted to Valium, thus, the appellant had access to Valium and "sometimes overdosed or would take the Valium." Hackenmiller was less successful, however, in investigating the paternal side of the appellant's family. Specifically, she testified that she was still trying to identify five or six children from his father's legal marriage to another woman. In noting the relationship of the appellant's parents, Hackenmiller testified that the appellant's mother and father, although never married, spent seventeen years together.

Hackenmiller was in possession of records from various institutions where the appellant had been confined as a juvenile which indicated that the appellant responded well to positive reinforcement in an institutional setting. She referred to a report from a family therapy session when the appellant was twelve years old indicating that many of his problems derive from his home and parental situation. Another psychiatric report, also from 1979, indicated that the appellant was extremely motivated and performed very well in the therapeutic session. However, the report indicated that the appellant's home life was lacking in support and psychological warmth. Another report supported these conclusions, including that the appellant responded in a positive manner to praise and encouragement. These reports focused on the fact that the appellant required continuity between his teachers, parents and school authorities regarding his discipline. Hackenmiller reported that despite this advice, continuity in the home was not maintained. A discharge summary from the Parthenon Pavilion in

47

1981 indicated that the appellant had "moved home, switched school, and also had difficulty at home with his father being accused of a sexual relationship with his maternal aunt." This document also related that the appellant was responding well to treatment in a therapeutic environment. A 1981 report from the Wilder Youth Development Center reiterated that the appellant was doing extremely well in therapeutic environment and he was making excellent grades in school. A Madison Hospital admission in 1982 indicated that the appellant's behavioral problems included problems at school, home and with legal authorities. This document diagnosed the appellant with "adjustment disorder and passive-dependent personality." The document also indicated that the appellant's drug and alcohol usage was greatly influenced by his brothers and his peers. Another report indicated that the appellant associated with youths that got into trouble and that the appellant appeared to be a follower. A social history update from the Spencer Youth Center related that, within five months after the appellant's release from Wilder Youth Development Center, he had returned to using alcohol and drugs. A classification summary performed by the DeDe Wallace Center in 1982 provided that the appellant sought help in that he wished to end his "crime-drug cycle." None of this information was introduced at the penalty phase of the trial. The appellant's juvenile TDOC records listed indicators that the appellant was the victim of sexual abuse by other inmates and that the appellant attempted suicide and was placed on suicide watch. On cross-examination, Hackenmiller admitted that Dr. Nurcombe had access to all but the "Wilder" records, however, she rationalized that Dr. Nurcombe only covered the areas of mitigation import "minimally."

2000 WL 1562865 at *5-6, 8-9, 10-12.

Aside from this testimony, the Tennessee Court of Criminal Appeals cited other evidence of

trial counsel's work prior to sentencing.

> Dr. Ann Charvet, a clinical sociologist, assisted defense counsel with the mitigation aspect of the case. Charvet testified that she began work on this case during the first week of December 1991. The trial began in January 1992. She was compensated for 77 hours worked on this case. Charvet admitted that she had submitted a supplementary invoice for an additional 75 hours, however, she was never compensated for this time. She stated that this was not sufficient time for her to perform her function as a mitigation investigator. Specifically, she explained that a major part of her investigation involved the compilation of various documents relating to the appellant's life and this aspect of the investigation is very time consuming.

> In the present case, Charvet interviewed the primary witnesses, i.e., the appellant's mother, stepfather, a brother, a sister-in-law, and some friends. Other primary witnesses, the appellant's brothers, were resistant to being interviewed. She was not

48

successful in locating family members from the appellant's father's side of the family. Charvet testified that, had she had more time, she would have found secondary witnesses who could have "identif[ied] and validat[ed] the conditions in the home." Their testimony serves to make the testimony of the primary witnesses more credible. She explained that a lead attorney was not designated within the defense team. This resulted in confusion and, in her opinion, her information was not being properly utilized. She also felt restricted in her investigation. For example, she was not able to review all of the records the defense team had obtained prior to her involvement in the case. Had Dr. Charvet been provided either more time to prepare or additional financial resources, "[she] would have sought witnesses to tell a more complete story of who is Henry Hodges. [She] would have sought the humanization of him. [She] would have primarily tried to identify more clearly the conflict that he faced in coming to grips with his own sexuality." She testified that, had she been provided sufficient time, she would have interviewed counselors and mental health people and she would have interviewed prisoners with whom the appellant had been incarcerated.

Id. at **9-10.

The appellate factual findings in Petitioner's direct appeal reflects the proof presented by

Petitioner's counsel at sentencing:

The appellant's mother and father maintained a "common law" marriage that lasted eighteen years. The appellant and one brother were born to this relationship. The appellant's mother was the victim of severe spouse abuse during the relationship.

According to family members, the appellant was his father's favorite. The appellant was never punished while his brother and two half-brothers were the subject of harsh punishment. If the appellant's mother punished him, his father would become angry at her. The appellant's mother and half-brother described the appellant as "spoiled." The half-brother stated that the appellant could do whatever he desired without fear of punishment.

The record reveals that the appellant lived a normal life until he was twelve years of age. When he reached this age, he refused to go to school, began to associate with older men, and started sniffing glue-anything that would make him "high." He frequently ran away from home and occasionally would stay away for weeks before returning home. Although the appellant's mother moved the family frequently, the appellant's lifestyle did not change. He was in custody of juvenile authorities on sixteen different occasions. While confined to a juvenile treatment facility in Chattanooga, the appellant escaped. He subsequently committed several serious offenses, which resulted in his convictions for robbery with a deadly weapon, simple

49

robbery, and an attempt to commit a felony kidnapping.

The appellant's maternal grandfather was an alcoholic. One of the appellant's half-brothers is a recovering alcoholic. The appellant has a history of abusing marijuana. He smoked as many as eight marijuana cigarettes in a twenty-four hour period.

The appellant testified that he was sexually abused by a complete stranger when he was twelve years of age. FN7. However, he never revealed this abuse to any member of his family. Nor did he tell the juvenile authorities or the Tennessee prison officials that he had been sexually abused. The sexual abuse did not surface until he had been arrested for the Fulton County, Georgia murder. He related this to an official at the Georgia Diagnostic Center. The appellant refused to tell his parents about the sexual abuse because his father was homophobic and the appellant felt his mother would blame him for the occurrence. He did not tell the juvenile authorities because he knew they would tell his mother.

> FN7. The appellant testified that a stranger offered him a ride home. He accepted. However, the stranger allegedly drove to his own home and forced the appellant to engage in oral and anal sex. The stranger subsequently returned the appellant to a location near the appellant's residence.

Shortly after the sexual abuse incident, the appellant made his brother perform fellatio on him. He took a young female cousin into a closet for the purpose of engaging in sexual conduct. When the murder occurred, he was living with Trina Brown. He was also engaging in homosexual male prostitution.

The appellant's mother opined that fifteen-year-old Trina Brown completely dominated the appellant. Trina Brown testified that the appellant did not want to kill the victim and that it was she, not the appellant, who made the decision to kill the victim. FN8. She was afraid that if the victim was permitted to live, he would have the appellant arrested, and as a result, she would lose the appellant. Therefore, she told the appellant to kill the victim. The appellant admitted on cross-examination that both he and Brown tried to manipulate each other. He admitted that he had previously stated that Brown "would jump off a building" if he asked her.

> FN8. The appellant admitted, however, that this was the first time Trina Brown had revealed this fact. Her prior statements were contrary to this testimony. It is also contrary to her testimony that the appellant

50

had told her on two separate occasions that he was going to murder and rob the next homosexual that propositioned him in order to raise money for their move to Florida. She apparently thought she could prevent the imposition of a death sentence by testifying in this manner. She admitted that she still loved the appellant and would do anything to help him. They continued to communicate with each other through letters and tapes.

Dr. Barry Nurcombe, a child psychiatrist, testified as an expert for the defense. He described the appellant as having an anti-social personality disorder. He outlined the appellant's family life, his childhood, the incident involving sexual abuse, his drug dependence, the murder, his relationship with Brown, his difficulty coping with stress, his poor judgment, which was aggravated by the use of marijuana, and other facts prior to expressing his professional opinion. He concluded that the appellant had a low self-esteem. He also concluded that although a grown man, the appellant reacts the same as a seven or eight-year-old child. He found that the appellant had established the rudiments of psychological disturbance prior to the incident involving sexual abuse.

According to Dr. Nurcombe, the appellant wanted revenge for the sexual abuse that he encountered in his childhood; and he viewed homosexuals as a class rather than individuals. Nurcombe related that Brown had told the appellant's sister-in-law the appellant was a homosexual. This was related by the sister-in-law to the appellant's half-brother, who confronted the appellant with this fact. Dr. Nurcombe opined that the stress resulting from this incident, coupled with the fear that the appellant's family might discover his homosexual lifestyle, motivated the appellant to kill the victim-the next homosexual that propositioned him.

The appellant told Dr. Nurcombe that "he did not wish to be thought [of as] crazy, that he felt that he did things deliberately [on the night in question, and] that any attempt to explain what he had done on psychological grounds was hogwash." The following colloquy occurred during Nurcombe cross-examination:

> Q. Henry Hodges told you exactly why he killed Mr. Bassett but you think that you have a better grasp on why he did it than Mr. Hodges does, himself, is that correct?
>
> A. Yes, I do.

1995 WL 301443 at *3-4

As to Petitioner's claim about trial counsel's failure to conduct an adequate investigation for sentencing, the Tennessee Court of Criminal Appeals summarized Petitioner's contentions and adopted the trial court's ruling:

> The appellant claims that trial counsel was ineffective "by failing to conduct a reasonable and competent mitigation investigation, by usurping the function of specialized experts in this area, by focusing upon a mitigation theory which was neither investigated nor corroborated, and by ignoring, overlooking or unjustifiably rejecting significant evidence of mitigation which was never pursued and never presented to the jury." Specifically, he contends that, in the absence of a sufficient mitigation investigation, the appellant "was defined to the jury by the worst times of his life, not in the broader context where he would be reflected in a more positive and more sympathetic light than the crime depicted."

> He contends that counsel failed to obtained pertinent records, including prison, medical, educational and parole records, which would have reflected mitigation themes contrary to that asserted by defense counsel. The appellant also asserts that counsel failed to locate numerous lay witnesses, such as friends, teachers, classmates, co-workers, juvenile authorities and jail personnel to testify regarding the appellant's life and experiences. In sum, the appellant defines counsel's last minute effort at a meaningful mitigation investigation as a "helter skelter intense effort to prepare a case for trial in two months," which made it "absolutely impossible to present a coherent, much less, credible presentation to the jury to spare the life of Henry Hodges." Indeed, he asserts that counsel's premature commitment to an unverified and uninvestigated mitigation theme, i.e., isolated homosexual rape, caused defense counsel to reject, ignore, or overlook powerful mitigation evidence which opened up numerous avenues to defend    the following positive themes could have been presented to the jury; (1) the appellant was "starved for positive reinforcement and wanted to please his elders when he was twelve years old;" (2) the appellant was "extremely motivated and performed very well" in a structured environment; (3) the appellant "responded well to praise and encouragement;" and (4) the appellant was a "follower" and susceptible to outside influence.

The post-conviction [trial] court made the following finding and conclusion on this claim:

> [A]ppellant now contends that perhaps a psychologist and a psychological examiner should have been called, but they were not called at the January 1999 hearing Perhaps there was more family history that could be helpful or school records or neighbors, but none were called at the January 1999 hearing. The only new information presented were some records from a juvenile institution but these were

52

cumulative to information presented at trial in 1992.

The [appellant] with an ineffective assistance of counsel claim must not only allege prejudice, but must prove prejudice by competent evidence. If the [appellant] says his lawyer failed to put on certain evidence, the [appellant] must produce that evidence, to not only show the fact finder that the evidence is producible, but that the evidence would have been helpful. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so that the trial judge can properly evaluate the evidence or the witness. See Black v. State, 794 S .W.2d 752 (Tenn.Crim.App.1990); see also Brown v. McGinnis, 922 F .2d 425 (7th Cir.1991) and Goode v. Armentrout, 925 F.2d 239 (8th Cir.1991).

Here, the defense had a theory of mitigation in the 1992 trial. This centered around the sexual abuse of the [appellant] when he was twelve. The defense presented evidence that the killing at issue in this case was motivated by a subconscious desire for revenge for the sexual abuse inflicted upon him and for rage at the discovery by his family of his homosexuality. This theory was supported by the testimony of Dr. Barry Nurcombe who is the head of Child Psychiatry at Vanderbilt Medical School. Dr. Nurcombe was an impressive witness. He was not a professional witness and seldom testified in court. He was well versed in the [appellant's] prior background, and well articulated the defense theory.

[trial court's extensive description of other mitigation evidence at sentencing omitted]

Under the standard set forth in Goad, we conclude that the appellant has not presented any evidence at the post-conviction hearing substantially different from that proof introduced during the penalty phase. The mitigation specialist retained for post-conviction purposes admitted that Dr. Nurcombe had access to the same records that she had, save one. "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Strickland v. Washington, 466 U.S. at 691, 104 S.Ct. at 2066 Considering the evidence before this court, we conclude that additional evidence from further mitigation investigation would be merely cumulative to that evidence obtained by trial counsel prior to the sentencing hearing. The appellant suggests that trial counsel should have presented this information in a different manner. This allegation is misplaced; counsel cannot be deemed ineffective merely because a different procedure or strategy might have produced a different result. Given the records presently before this court, we conclude that trial counsel adequately investigated the appellant's background and presented a case in mitigation that was supported by the information introduced. This claim is without merit.

53

2000 WL 1562865 at *23-24, 27.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S. 510, 521 (2003). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential mitigation evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

The proof introduced at Petitioner's sentencing hearing, included Petitioner's personal history, his family problems, the testimony of an expert psychiatrist as well as the assistance of mitigation specialist. Given the Petitioner's personal history, Petitioner's trial counsel's theory of mitigation was within the range of reason. The Tennessee courts' rulings on this claim are reasonable.

As to Petitioner's proof in this action of Petitioner's bipolar disorder and drug dependency, for reasons stated earlier, such evaluations that are years after the events are not probative. Supra at p. 17. Given the state and federal law upholding convictions of defendants with bipolar disorder, supra at p. 18, the Court concludes this proof would not have altered the fact of Petitioner's conviction or sentence.

### c. Petitioner's Claims of Ineffectiveness of his Appellate Counsel

As noted earlier, Petitioner's claim is that his appellate counsel should not have raised on appeal the claims that are asserted in this action. (Docket Entry No. 32, Amended Petition at p. 19)

54

Petitioner asserts his appellate counsel should have researched "ligature strangulation." Id. This subpart appears to relate not to trial counsel, but a deficiency to Petitioner's appellate counsel. Id. at pp. 19-20.

In Murray v. Carrier, 477 U.S. 478, 485-86 (1986), the Court reviewed its precedents and held that acts or omission of a petitioner's trial and appellate counsel may constitute cause. In Engle v. Isaac, 456 U.S. 107 (1982), the Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel could not establish cause, id. at 133-34, unless the decision is of constitutional significance. Murray, 477 U.S. at 486-88. In Murray, the Supreme Court made it clear that procedural defaults attributed to ignorance or the inadvertence of counsel or as a result of a deliberate appellate strategy that fails to raise a "particular claim" would preclude federal habeas review of a claim. 477 U.S. at 487. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." Id. at 486. As to the failure to raise a claim on appeal, the Court also observed that "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

The Court concludes that any omission of Petitioner's appellate counsel to raise any of the cited claims on any state appeal is not grounds for habeas relief.

### d. The Validity of Petitioner's Guilty Plea

A related claim is claim 32 that Petitioner's plea was an invalid guilty plea because his plea was not knowingly, intelligently and voluntarily entered based upon his counsel's ineffectiveness.

State trial courts are required to advise a state defendant of his rights under the Due Process Clause of the Fourteenth Amendment to ensure a voluntary and knowing plea of guilty. Boykin v. Alabama, 395 U.S. 238, 242 (1969). The record should reflect a full understanding of the direct consequences so that the plea represents a voluntary and intelligent choice among the alternatives. North Carolina v. Alford, 400 U.S. 25, 31 (1970). As pertinent here, the Constitution requires that a defendant be informed of the direct consequences of his plea, Brady v. United States, 397 U.S. 742, 755 (1970) including the maximum possible sentence. Riggins v. McMackin, 935 F.2d 790, 796 (6th Cir. 1991). Counsel's expectation about the sentence are not grounds for invalidating the plea agreement, Stout v. United States, 508 F.2d 951, 953 (6th Cir. 1975), absent gross error. Sparks v. Sowders, 852 F.2d 882, 885 (6th Cir. 1988).

There is not any showing here that Petitioner was inadequately advised as to the consequences of the plea. Petitioner understood his rights, the elements of the offense and State's proof and voluntarily entered his guilty plea. The state court records reflect that Petitioner was pleased with his counsel and never complained about their representation. Supra at p. 33. Petitioner never testified in his state post-conviction hearing that his plea was involuntary or that he lacked knowledge of the consequences of his guilty plea. As found above, Petitioner had effective assistance of counsel in deciding to plead guilty in a case where the proof of his guilt was overwhelming. This related claim also lacks merit.

## 2. Petitioner's Jury claims

### a. Voir Dire Claims

Petitioner's claim 8 asserts denial of a fair and impartial jury in violation of the Sixth, Eighth and Fourteenth Amendments because the trial court precluded questions that Petitioner asserts are

56